# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

DAVID L. WALTON, JR.,                    )
           Plaintiff,                    )
                                         )
        v.                                )     CAUSE NO.: 2:09-CV-386-PRC
                                          )
UNITED STATES STEEL                       )
CORPORATION,                              )
           Defendant.                    )

## OPINION AND ORDER

This matter is before the Court on Defendant United States Steel Corporation's ("U.S. Steel") Motion for Summary Judgment [DE 27]. U.S. Steel seeks summary judgment in its favor on all claims in Plaintiff David L. Walton, Jr.'s ("Walton") Complaint. For the reasons set forth below, the Court grants U.S. Steel's Motion for Summary Judgment.

## PROCEDURAL BACKGROUND

On October 16, 2009, Walton filed his Complaint in the Superior Court of Lake County, Indiana. U.S. Steel removed the action to this Court on November 18, 2009. In the Complaint, Walton alleges that U.S. Steel, his current employer, subjected him to racial discrimination, retaliation, and harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)(5), as amended, and 42 U.S.C. § 1981.

U.S. Steel filed the instant Motion for Summary Judgment on March 19, 2012. Walton filed a response on April 27, 2012, and a supplement to his response on May 15, 2012. U.S. Steel filed its reply and a Federal Rule of Civil Procedure 56 Motion to Strike on May 30, 2012. Walton filed a response to the Motion to Strike on June 29, 2012. U.S. Steel filed its reply to the Motion to Strike on July 16, 2012.

The parties orally agreed on the record to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "[S]ummary judgment is appropriate – in fact, is mandated – where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotations omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56(c). The moving party may discharge its initial responsibility by simply "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. When the nonmoving party would have the burden of proof

at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex*, 477 U.S. at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials, and, if the moving party has "produced sufficient evidence to support a conclusion that there are no genuine issues for trial," then the burden shifts to the nonmoving party to show that an issue of material fact exists. *Becker v. Tenenbaum-Hill Assoc.*, 914 F.2d 107, 110-111 (7th Cir. 1990) (citations omitted); *see also Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e)(2), (3); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," but must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255; *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009); *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50.

## MOTION TO STRIKE

On May 30, 2012, U.S. Steel filed a Federal Rule of Civil Procedure 56 motion to strike affidavits and portions of affidavits relied upon by Walton in his opposition to U.S. Steel's motion for summary judgment. Specifically, U.S. Steel moved to strike the Affidavits of Anthony Galoozis, Shawn Manning, Clifton Sandifer, Jr., Colbert Smith, Vivian Strickland, and David Walton, Sr. because they fail to comply with Federal Rule of Civil Procedure 56(c)(4), the Federal Rules of Evidence 602 and 902, and 28 U.S.C. § 1746. U.S. Steel also moved to strike certain paragraphs of the Affidavit of David Walton, asserting they were inconsistent with his prior deposition testimony, were not based on personal knowledge, and contained self-serving, speculative, and conclusory statements. However, even considering such evidence, this Court concludes that Walton has failed to produce sufficient evidence to establish viable claims of race discrimination, harassment, and retaliation under Title VII and 42 U.S.C. § 1981. As such, the Court **DENIES as moot** U.S. Steel's Motion to Strike Affidavits and Portions of Affidavits Relied Upon by Plaintiff in Opposition to United States Steel Corporation's Motion for Summary Judgment [DE 40].

## MATERIAL FACTS

Walton, who is African-American, began working at U.S. Steel's manufacturing facility in Gary, Indiana ("Gary Works") on April 3, 2006. Walton was hired as a Labor Grade 1 Utility Person in the Sheet Products Department and worked in the North Sheet Mill where he operated a crane under the supervision of Wade Piar, Coordinator of North Sheet Annealing. Walton is a member of the United Steelworkers of America ("USW") Union, the recognized collective bargaining representative of labor employees at Gary Works. U.S. Steel and the USW negotiated a Basic Labor Agreement ("BLA"), which govern the terms of employment for labor employees at Gary Works. The BLA provides for the exclusive right of U.S. Steel to manage the business and direct the working forces, which includes dealing with grievances, arbitration, discipline, permanent vacancies, transfers, and drug and alcohol testing. Walton received a copy of the BLA and U.S. Steel's employment policies prohibiting harassment and discrimination.

On November 29, 2006, U.S. Steel posted a plant-wide job opening for a Maintenance Technician Electrical Learner in the Sheet Products Department. The position consisted of classroom sessions and on-the-job training with journeymen on the electrical crew. A union co-worker, Benny Guardardo, suggested to Walton that he should apply for the vacancy and also allegedly said that the white workers on the electrical crew would be upset if Walton passed the test for the job. Walton, however, never reported Guardardo's comment to U.S. Steel management.

Walton took the test and was notified that he was awarded a Maintenance Technician Electrical Learner ('electrical learner') position in December, 2006. Shawn Manning, a white employee from the Tin Products Department, was also awarded another of the positions. Walton contends that Linda Woods, the Human Resource Coordinator, told him that the position would be

in the North Sheet Mill. Then, on December 20, 2006, a few days after Walton learned he passed the test, Piar allegedly asked him who he paid to pass the test. Piar also allegedly said to Walton that because he had only been in the department for six months, he was going to get some work out of him and was not going to release him to the new position.

The BLA authorizes U.S. Steel managers to retain (sometimes referred to as "hold hostage") employees on their former job for a period of time after the employee is awarded a job vacancy. Article 5-E-10-e of the BLA provides:

> Should the Company deem it necessary to retain an Employee on his/her former job in order to continue efficient operation, it may do so, for a maximum of sixty (60) days, on the basis of establishing such Employee on the new job and temporarily assigning him/her to his/her former job until a suitable replacement can be trained for the job or its performance is no longer required.

(Travis Decl. (3-19-12) ¶ 9; Travis Decl (3-19-12), Ex. A.) U.S. Steel managers frequently retain employees in their former position after an employee is awarded a job vacancy. Piar retained Walton as a crane operator because there was a shortage of crane operators in the Annealing Department and the Employee Relations Department did not inform him that Walton's release was necessary. Although Piar did not release Walton from his assignment as a crane operator until March 2007, Piar did permit Walton to leave his shift early to attend the classroom training sessions for the electrical learner position in January, 2007.

Walton alleges that in December, 2006, he witnessed several instances of inappropriate behavior on the part of several of his co-workers. For instance, when passing through an office, Walton witnessed co-workers Dwayne Belt, who is allegedly a member of a motorcycle gang of white supremacists, and Russell Francie with their heads shaved. Walton also witnessed that Belt

had a tattoo of a Confederate flag on his arm. However, Walton never reported what he had seen to U.S. Steel management.

On December 11, 2006, Walton was involved in an accident while operating his crane. The tongs on Walton's crane disengaged when he attempted to place a hood over a steel coil. A foreman identified as "Steve" from the 5-stand area of the Sheet Division supervised an investigation into the cause of the accident. According to Walton, Piar was in a meeting at the time of the accident and arrived to the area while crane repairmen were inspecting and repairing the crane. During the course of the investigation, Steve began preparing a form for Walton for a drug and alcohol ("D&A") test, if necessary. The BLA authorizes D&A tests when human error is implicated in a crane accident. Specifically, Article 3-G-2 of the BLA states:

> The Company may require an Employee to submit to for cause drug and alcohol testing where there is a reasonable basis to believe the Employee is affected by drugs or alcohol. Employees involved in an accident will be tested only when an error in their coordination or judgment could have contributed to the accident.

(Travis Decl. (3-19-12) ¶ 15; Travis Decl. (3-19-12), Ex. C.) After investigating the accident, Piar concluded that the accident was due to human error and therefore directed Walton to take a D&A test. Walton passed the test but received a written warning for this incident on December 22, 2006.

On January 28, 2007, Walton was involved in another crane incident when a coil that his crane was transporting collided with a stack of coils and knocked the top coil off the stack and onto the floor. Walton contends that there was a problem with the crane earlier that day, but after this accident, crane repairmen inspected the crane's bridge brake, trolley, and bridge controls on Walton's crane and did not find any mechanical problems. Thomas Puzas, the investigating supervisor, determined that the accident was due to human error.

7

The next day, Piar issued a one-day suspension to Walton for failing to keep control of the lift, which caused the January 28, 2007, accident. After receiving the discipline, Walton alleges that he complained to Piar that he felt he was being targeted because he is African-American. The USW subsequently filed a complaint under the BLA challenging the discipline Piar issued to Walton. After exhausting the appeal process, Walton agreed to dispose of the grievance with time served and he never served the one-day suspension or lost pay from this discipline.

On January 29, 2007, Walton alleges that he talked to Piar about another employee, Mark Sutherland, who also knocked down a coil while operating a crane in December 2006, but who was allegedly treated more favorably than him. Walton claimed that U.S. Steel did not investigate Sutherland's accident and Sutherland was never tested for drugs or alcohol, or disciplined. U.S. Steel, however, did investigate Sutherland's accident and Robert Knight, the investigating supervisor, found that a coil being lifted by Sutherland's crane accident had coned at the bottom and struck a stack of coils causing the top coil to fall to the floor. Knight's report stated that Sutherland had no way of seeing that the eye of the coil had coned from the bottom. Sutherland was not tested for drugs or alcohol because his accident was not attributable to human error. Walton also alleges that, during his January 29, 2007, conversation with Piar, he complained to Piar that he treated Scot Whitlock more favorably than him because Piar did not discipline Whitlock for being disruptive to Piar during a safety meeting.

On February 2, 2007, Walton's locker was vandalized with spray pain and motor grease. Walton claims that the locker incident is related to his January 29, 2007, conversation with Piar when he claimed that Piar treated Sutherland and Whitlock more favorably than him. Joe Travis, a Staff Supervisor of Labor Relations at Gary Works, advised employees in Walton's department

that this type of conduct was prohibited. Gary Works Security Investigator Anthony Kunkle interviewed Whitlock, who was suspected of vandalizing Walton's locker and performing other improper acts. U.S. Steel ultimately was unable to determine who had vandalized Walton's locker, but Whitlock was disciplined for his involvement in other inappropriate acts.

Several weeks later, on February 12, 2007, Walton met with USW Civil Rights Committee Chairman Clifton Sandifer, Jr. and USW President Anthony Galoozis to discuss the locker incident and his release to the electrical learner's position. Walton alleges that Galoozis called Area Manager John Rosser, who supervised Piar, to ask about Walton's release, but he does not know what was actually discussed.

On February 13, 2007, the crane operators who worked for Piar were sitting in a shack receiving work orders from Piar when Walton asked Piar if he had reached a decision as to when he would be released to the electrical learner position. Piar then expressed anger toward Walton for going to his boss, Rosser, about the fact that he had not yet been released to his new position. Piar and Walton then got into an argument with Piar saying to Walton: "if you want to play games, then you are going to have trouble." (Walton Dep. 118.) Piar also stated to Walton that "there [is] nothing special about [you], I have [held] people for up to a year." (Id.) After that exchange, Piar directed Walton to go to his crane. Walton went to his crane, but returned to the shack because a red safety light was illuminated on the crane indicating that he could not board the crane. Piar then asked Walton why he was not in his crane and Walton said that he could not board the crane because the red light indicated a safety issue. Piar indicated that he would clear the red light and again directed Walton to return to his crane. Instead of boarding the crane, Walton telephoned his Union President. Piar grabbed the telephone from Walton's hand and said "if you want to play games, you

will be sorry." (Walton Dep. at 118-19, 122.) The argument continued with Piar again instructing Walton to board his crane. Piar told Walton that it was safe to board the crane as the red light was illuminated because the crane operator from the previous shift had forgotten to switch the light to green. After entering the crane, Walton telephoned U.S. Steel Security to make an intimidation report. While Walton filled out his intimidation report, Piar returned to find that Walton was not in his crane. Another argument ensued and Piar instructed Security to send Walton for a D&A test based on his poor judgment. After the test, Security escorted Walton to his car and Walton went home for the balance of his shift.

The next day, Piar issued a three-day suspension to Walton for failing to complete an assigned task on February 13, 2007. The USW then filed a complaint and grievance under the BLA challenging the discipline brought against Walton. After exhausting the appeal process, Walton agreed to a one-day suspension, but he never served the suspension and only missed work for the balance of his shift on February 13, 2007. At some later point after the incident, Walton heard from Sandifer that his co-workers referred to a USW Griever as "nigger lover" because he objected to the discipline issued against Walton. Subsequently, U.S. Steel counseled Piar for his behavior toward Walton. To avoid further conflict, Walton was moved to the South Sheet Mill where he began his electrical learner's position in March, 2007.

In July 2008, Walton walked through a manager's office and witnessed a poster that pictured tanks, airplanes, and soldiers marching with Nazi flags. The bottom of the poster stated "Teamwork—If we stick together, we can accomplish anything." Walton called USW Civil Rights Chairman Sandifer and the poster was removed from the wall with 30 minutes. Walton, however, did not report the poster incident to U.S. Steel management.

Walton filed two separate charges of race discrimination and retaliation with the U.S. Equal Employment Opportunity Commission ("EEOC") on May 25, 2007, and January 22, 2009. The EEOC issued Notice of Rights letters to Walton on July 22, 2009, and July 24, 2009, stating that the EEOC was unable to conclude that the information obtained through its investigation established violations of the applicable statutes and law.

## ANALYSIS

U.S. Steel moves for summary judgment, arguing that Walton cannot prevail on his race discrimination, harassment, and retaliation claims. The Court now considers each claim in turn.

### A. Race Discrimination

In his Complaint, Walton asserts that U.S. Steel violated Title VII and 42 U.S.C. § 1981, both of which prohibit employers from discriminating against employees on the basis of their race.

Title VII of the Civil Rights Act of 1964 provides, in part, that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The same analysis applies to claims for race discrimination brought under Section 1981 as those brought under Title VII. *See Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 403-04 (7th Cir. 2007); *Williams v. Waste Mgmt. of Ill., Inc.*, 361 F.3d 1021, 1028 (7th Cir. 2004); *Walker v. Abbott Labs.,* 340 F.3d 471, 474 (7th Cir. 2003) (noting that Title VII and Section 1981 cases have similar liability standards but different remedies). To prove racial discrimination under Title VII and Section 1981, a plaintiff may proceed either under the direct method or the indirect method. *See Humphries,* 474

F.3d at 403-04; *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012); *Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005).

### 1. Direct Method

Walton first proceeds under the direct method of proof. To survive summary judgment under the direct method, the plaintiff "must demonstrate a triable issue as to whether discrimination motivated the adverse employment action of which he complains." *Davis v. Time Warner Cable of Se. Wis., LP*, 651 F.3d 664, 672 (7th Cir. 2011) (citing *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009)). Direct evidence can take the following forms: (1) an outright admission by the decisionmaker that the prohibited action was undertaken, or (2) circumstantial evidence of a discriminatory reason by the employer. *See Rogers v. City of Chi.*, 320 F.3d 748, 753 (7th Cir. 2003). The plaintiff can establish the latter through a long chain of inferences, which has been described as "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Davis*, 651 F.3d at 672 (quoting *Silverman v. Bd. of Educ. of Chi.*, 637 F.3d 729, 734 (7th Cir. 2011)). Circumstantial evidence typically falls into one of the following categories:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

*Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009) (quoting *Sun v. Bd. of Trustees*, 473 F.3d 799, 812 (7th Cir. 2007)) (citing *Troupe v. May Dep't Stores, Inc.*, 20 F.3d 734, 736 (7th Cir. 1994)). Proving a case circumstantially under the direct method of proof requires a

plaintiff to produce evidence that "point[s] directly to a discriminatory reason for the employer's action" and "directly relate[s] to the employment decision." *Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1071 (7th Cir. 2012) (citations omitted). However, "'smoking gun' evidence of discriminatory intent is hard to come by." *Coleman*, 667 F.3d at 845 (citing *United States Postal Serv. Bd. of Governors v. Aiken*, 460 U.S. 711, 716 (1983)).

Walton first contends under the direct method that Piar, his white supervisor, had a discriminatory motive, which was evidenced by improper comments and abusive behavior. Walton's first piece of evidence consists of an alleged comment from a co-worker, Benny Guardardo, who, according to Walton, "indicated that it would anger white individuals" if he passed the test for the electrical learner's job. (Pl.'s Br. at 4). Here, Walton attempts to characterize this comment as evidence that Piar was angered by him passing the test because of his race.

But this comment cannot defeat summary judgment because any comment that Walton repeats from a co-worker constitutes inadmissible hearsay and thus cannot be relied upon to avoid summary judgment. *See MMG Fin. Corp. v. Midwest Amusements Park, LLC,* 630 F.3d 651, 656 (7th Cir. 2011). Even assuming that Guardardo's comment would be admissible at trial, the comment is not temporally proximate to any of Walton's alleged adverse actions. For example, Walton contends that Guardardo made the comment in September 2006, but Piar's decision to retain Walton did not occur until December 2006. Further, Walton's disciplinary actions related to his crane incident and altercation with Piar occurred even later, in January and February 2007, respectively. Because Guardardo's comment is too remote in time from any of the adverse actions Walton alleges, it does not constitute circumstantial evidence of "suspicious timing" and fails to raise an inference of a discriminatory motive or conduct on the part of Piar. *See Nichols v. S. Ill.*

13

*Univ.-Edwardsville*, 510 F.3d 772, 781-82 (7th Cir. 2007) ("[S]tray remarks that are neither proximate nor related to the employment decision are insufficient to defeat summary judgment.").

Furthermore, Walton has not produced any evidence that links Guardardo's comment to Piar or any of the alleged adverse employment actions in this case. In fact, Guardardo never suggested to Walton that Piar would be angered by him passing the test. Rather, Guardardo indicated that white workers on the electrical crew would be upset if Walton passed the test for the electrical learner position. (Walton Dep. at 18-21; Walton Dep., Ex. 1.) Here, the evidence in the case establishes that Piar is not on the electrical crew. Therefore, Guardardo's comment does not directly point to Piar having his own racial animus or bias against Walton and, as a result, cannot be tied to the adverse actions alleged in this case. *See Adams v. Wal-Mart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir. 2003) (finding that "[B]igotry, *per se*, is not actionable. It is actionable only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse employment action.")

Walton's next piece of "suspicious timing" evidence consists of Piar moving him from his father's crew and allegedly saying that he was too cooky and "needed to be [out] from [under] his father's wing." (Pl.'s Br. at 5.) Here, Walton complains that Piar removed him from the crew where he was working with his father and other African-American crane operators to a crew where he was the only African-American crane operator. But these alleged acts and comments do not pertain to Piar's decision to retain Walton as a crane operator for three months or to the discipline Piar issued to Walton regarding his crane incidents and altercation with Piar. Nor is there any evidence to suggest that Piar's actions or comments were in any way related to Walton's African-American race. Furthermore, while Walton also offers as "suspicious timing" evidence the comment that Piar

allegedly made about his asking who Walton had paid to pass the electrical learner's test, Walton offers no evidence that Piar's statement was in anyway related to his race.

In his opposition brief, Walton next contends that Piar's failure to follow internal procedures constitutes circumstantial evidence of race discrimination. For example, he argues that Piar was required to post his crane operator position but that Piar did nothing after he learned that Walton had been awarded the new position. Here, Walton fails to identify any procedure that requires Piar to either post his vacancy or to post it within a specific time period. Furthermore, Walton has failed to produce any evidence that Piar's decision not to post his vacancy was premised in any way on discriminatory conduct. *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000) (a plaintiff must point to "a dishonest explanation [for deviating from a particular policy or process], a lie rather than an oddity or an error").

As established by the record, Piar follows an internal process with U.S. Steel's Labor Relations Department when he needs to fill a vacant position. At his deposition, Piar testified that he had previously made a request to fill vacant crane operator positions in his department that preexisted Walton's award of his new position. In other words, Piar was already short-handed when Walton learned that he had passed the test and would be awarded the electrical learner position. Walton asserts, however, that Piar's position about the shortage of crane operators "is an absolute falsehood." (Pl.'s Br. at 6.) But other than his bald assertion Walton offers no evidence to dispute Piar's testimony that he retained Walton in his crane operator position for three months due to a shortage of crane operators.[1] (Piar Decl. ¶ 6.)

---

[1] While Walton claims that Piar's affidavit, Piar's deposition testimony, and Rosser's deposition testimony "all conflict when it relates to what occurred with Walton [regarding the posting of his crane operator position]," he neither develops this argument nor provides the Court with citations to the evidence he references. (Pl.'s Br. at 5-6.)

Walton's deposition testimony also belies his assertion that Piar was not short-staffed and retained him as a crane operator for three months because of his race. Specifically, when questioned at his deposition about whether there was a shortage of crane operators at the time he wanted to be released to the electrical learner position, Walton responded: "I am not familiar with the manning of what the requirement is for that department." (Walton Dep. at 72.) Additionally, Walton's father acknowledged that there was a shortage of crane operators in Piar's department during the relevant period. (Walton Sr. Dep. at 156-57.) Therefore, Walton, has failed to produce any evidence to substantiate his claim that Piar deviated from U.S. Steel's internal policies or that the North Sheet Mill did not have a full staff of crane operators.[2] *See James v. Sheahan*, 137 F.3d 1003, 1007 (7th Cir. 1998) (declining to consider a deviation of a regular practice relevant and probative of discrimination where the plaintiff offered no evidence to refute the defendant's explanation).

Walton next contends that Piar's discriminatory animus toward him can be inferred by the way he handled a number of racial incidents at U.S. Steel. Specifically, he complains that Piar, who was required to follow U.S. Steel's policies prohibiting workplace discrimination and harassment, was a perpetrator of abusive behaviors, and failed to identify, document, and address these problems. For instance, Walton points out that when Piar heard an employee use the word "nigger," he did not document the incident or discipline the employee. But Walton does not allege that Piar himself used this derogatory term and the record establishes that Piar does not condone the use of the term. At his deposition, Walton testified that he tells employees who use these types of words that their behavior is unacceptable, and he would write up an employee if that warning is not followed. With

---

[2] Walton cites page 62 of Piar's deposition as support for his argument that Piar could have been staffed at full capacity when Walton was awarded his new job. (Pl.'s Br. at 6.) But nowhere in his deposition, including on page 62, does Piar make such a statement.

regard to the specific incident Walton complains about, Piar testified that he told the employee that he "wouldn't stand for that type of derogatory comment[] again." (Piar Dep. at 63.) Here, Walton has produced no evidence that Piar ever heard the employee make any further derogatory comments.

Finally, Walton contends that "Piar purposely chose to do sloppy work in investigating discrimination so that the behavior could continue." (Pl.'s Br. at 7.) Walton complains that Piar could only vaguely recall Walton's concerns about someone vandalizing his locker and other acts of racial intimidation that occurred at U.S. Steel. He points out that when he saw a poster involving a Nazi, he went to his union manager who had the poster taken down, caught the individual who put the poster up, and assisted the individual in getting counseling. While it is true that Piar does not recall specifics about Walton's locker incident, he did remember that Walton's father brought the matter to his attention and he reported it to the Employee Relations Department. (Piar Dep. at 49-50.) Accordingly, even if Walton's account of Piar's locker investigation is true, this evidence does not point directly to a discriminatory reason for Piar's actions or decisions. *See Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997) (rejecting poorly conducted investigation as evidence of discriminatory intent).

In sum, none of the comments or acts offered by Walton can be viewed by this Court as constituting circumstantial evidence of discriminatory animus on the part of Piar. Accordingly, Walton has failed to raise a genuine issue of material fact under the direct method, which would permit a reasonable jury to infer that Piar's comments or actions were the result of a discriminatory motive on the part of Piar.[3]

---

[3] Under the direct method of proof, Walton does not assert that any discipline he received as a result of crane accidents on December 11, 2006, and January 28, 2007, and the altercation he had with Piar on February 13, 2007, constitute circumstantial evidence of race discrimination.

## 2. *Indirect Method*

Walton next proceeds under the indirect, burden-shifting method established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the indirect method, a plaintiff must first establish a prima facie case of discrimination by providing evidence indicating that: "(1) he is a member of [a] protected class; (2) he was performing well enough to meet his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees not in his protected class were treated more favorably." *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 599-600 (7th Cir. 2010) (citing *Hilderbrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1030 (7th Cir. 2003)). If the plaintiff meets his burden of establishing a prima facie case, a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the challenged action. *McDonnell*, 411 U.S. at 802; *see Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006). If the defendant provides a legitimate, nondiscriminatory reason for its actions, the burden shifts back to the plaintiff to offer evidence indicating that "the proffered reason is actually a pretext for illegal discrimination." *Grigsby v. LaHood*, 628 F.3d 354, 359 (7th Cir. 2010) (citing *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 666 (7th Cir. 2007)).

In this case, U.S. Steel does not challenge Walton's ability to demonstrate that he is a member of a protected class and that his work performance met U.S. Steel's expectations. Rather, U.S. Steel asserts that Walton was not subjected to any adverse employment action and that Walton was not treated less favorably than similarly situated employees outside his protected class.

### a. Electrical Learner Position

Walton contends that he was subjected to an adverse employment action when Piar held him hostage in his former crane operator position for three months before releasing him to his new position. Walton further asserts that Shawn Manning, who was also awarded the electrical learner's position, was treated more favorably than him.

An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). While an adverse action may arise from a delayed promotion, a promotion that is only briefly delayed does not suffice. *See Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 532 (7th Cir. 2003) (noting that one-month delay in transfer, and uncertainty while waiting for transfer, are not actionable adverse employment actions); *Marshall v. Ill. Dep't of Human Servs.*, No. 00 C 4680, 2004 WL 432461, at *6 (N.D. Ill. Feb. 18, 2004) (two or three month delay in the final approval of a promotion does not constitute adverse employment action); *see also Bannon v. Univ. of Chi.*, 503 F.3d 623, 628 (7th Cir. 2007) (finding summary judgment appropriate because two-month delay in receiving a promotion did not constitute an adverse employment action).

Walton has failed to establish that he was subjected to an adverse employment action because he had to wait three months to be released to his new position. First, as discussed *supra*, the undisputed evidence establishes that Piar did not immediately release Walton to his new position because there was a shortage of crane operators in the North Sheet Mill. (Piar Decl. ¶ 6.) Walton has offered no credible evidence to dispute Piar's reason and again summarily asserts that he was wrongly held hostage. Nor does Walton contest that the BLA provided U.S. Steel with the right to

retain him in his former position for a period of time after he is awarded a vacancy in such situations. (Travis Decl. (3-19-12), ¶ 9; Travis Decl. (3-19-12), Ex. A at 79-80.) As noted above, Walton's position is belied by his deposition testimony and that of his father. Again, Walton testified that "[he was] not familiar with the manning of what the requirement is for the department," and his father acknowledged the shortage of crane operators in the North Sheet Mill. (Walton Dep. at 72; Walton Sr. Dep. at 156-57.) But even with the shortage of crane operators, Piar permitted Walton to leave his shift early to start the classroom portion of the learner position as early as January 2007. (Walton Dep. at 30, 33-34.) Accordingly, Walton has failed to show that he suffered an adverse employment action because he cannot establish that a three-month delay in being promoted to his new position constituted a significant change in his employment status.[4] *See Haywood*, 323 F.3d at 532 (one-month delay in transfer is not an adverse employment action), *Bannon*, 503 F.3d at 628 (two-month delay in receiving a promotion does not constitute an adverse employment action).

But even if Walton's three-month wait amounted to an adverse employment action, he cannot show that similarly situated employees were treated better. "Whether two employees are 'similarly situated' is a common sense inquiry that depends on the employment context." *Filar v. Bd. of Educ. of Chi.*, 526 F.3d 1054, 1061 (7th Cir. 2008) (citing *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000)). Thus, identifying a suitable comparator demands a showing that two employees shared the same supervisor, were subject to the same standards, and engaged in similar conduct without significant differentiating or mitigating circumstances. *Humphries*, 474 F.3d at

---

[4] Walton also contends that Manning's supervisor allegedly kept him informed as to when his transfer would occur and had taken steps to fill Manning's vacancy. (Walton Dep. at 102-04.) But even if Manning were apprised of the status of his transfer and Walton experienced uncertainty waiting for his transfer, Walton's uncertainty is not enough to constitute an adverse employment action. *See Haywood*, 323 F.3d at 532.

404-05; *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (proving that someone is "similarly situated" entails plaintiff "show[ing] that there is someone who is directly comparable . . . in all material respects.").

Walton compares himself to Shawn Manning who was also awarded a position in the electrical learner's program at the same time and allegedly had his position vacancy posted and was able to train his replacement. Walton's comparison to Manning is misplaced because Manning worked in the Tin Products Department and was supervised by an individual in the Roll Shop, not Piar. (Walton Dep. at 102-03.) Manning is also not a suitable comparator because Walton was released to his new position sooner than Manning so he cannot be viewed as being treated more favorably in any material way. Therefore, because Manning had a different job, worked in a different department, and was supervised by someone other than Piar, he is not similarly situated to Walton. *See McGowan v. Deere & Co.*, 581 F.3d 575, 580 (7th Cir. 2009) (finding that if an individual performing a different job "is not a similarly-situated individual in the first instance.")

Because Walton has failed to produce any evidence of an adverse employment action or a comparable employee who was treated better, he cannot establish a prima facie case of race discrimination as it relates to the electrical learner position. Even assuming that Walton could make out a prima facie case, he has not shown that U.S. Steel's reason for retaining him as a crane operator for three months is a pretext for discriminating against him on the basis of his race. "A pretext . . . is a deliberate falsehood." *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 666 (7th Cir. 2007); *see also Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004) ("Pretext is more than a mistake on the part of the employer; it is a phony excuse."). Thus, "[t]he focus of a

pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Stewart v. Henderson,* 207 F.3d 374, 378 (7th Cir. 2000).

In this case, U.S. Steel has offered a legitimate, non-discriminatory reason for its decision to retain Walton in his crane operator position for three months before releasing him to his new position. As stated, Piar needed Walton to remain in the North Sheet Mill because there was a shortage of crane operators. (Piar Decl. ¶ 6.) The undisputed evidence also establishes that Piar retained Dwayne Belt and James Swain, two white Operating Technicians, during the same period and Matthew Batey, a white crane operator, for a full year. (Piar Decl. ¶ 8; Travis Decl. (3-19-12), Ex. B.) Additionally, the fact that Piar allowed Walton to leave his shift early two-days a week to start the classroom portion of the electrical learner's program cuts against Walton's contention that Piar's reason for retaining him was due to racial animus. (Walton Dep. at 30, 33-34.) Because Walton cannot demonstrate pretext, his claim with respect to the electrical learner's position cannot stand.

### b. Hostage Pay

Walton next argues that he suffered an adverse employment action because he was denied his hostage pay. In asserting his position, Walton appears to be relying on Article 5-E-10-e of the BLA, which states in pertinent part:

> [A]fter two (2) weeks of being delayed the Employee shall be entitled to earnings not less than what s/he would have made had s/he been working on the new job on which s/he has been established and, where applicable, shall be paid as though such hours were credited to any trainee program.

(Travis Decl. (3-19-12), Ex. A at 79-80.) But despite this provision in the BLA, Walton has not provided this Court with any evidence that he is entitled to such pay, the amount of pay that he was allegedly denied, or the specific date that he was entitled to the pay. Walton also has failed to

identify the individual manager who denied him such pay, or whether that manager was racially biased against him. Furthermore, Walton has not asserted that Piar was in any way involved in the denial of his alleged hostage pay.

Even if Walton's assertion that a denial of hostage pay rises to the level of an adverse employment action, his claim would still fail because he has not presented evidence that a similarly situated employee was treated better than him. For example, he does not contend that another similarly situated employee received hostage pay after being retained for more than two weeks in his current position. Because Walton has not identified a suitable comparator on the issue of hostage pay or contend that white employees were treated more favorably, his claim cannot stand.

### c. D&A Tests and Discipline

Walton contends that Piar subjected him to unwarranted disciplinary measures after he passed the test for the electrical learner's job. Specifically, Walton asserts that Piar expressed racial hostility toward him when he directed him to take unnecessary D&A tests after two crane incidents and after his altercation with Piar. Walton also claims that Mark Sutherland was treated more favorably by Piar because he was not subjected to a D&A test or discipline after his crane accident.

Walton cannot establish that the D&A tests Piar directed him to take constitute adverse employment actions. The Seventh Circuit has held that a mandatory drug test is an actionable adverse action only if the test "is not performed in a routine fashion following the regular and legitimate practices of the employer, but is conducted in a manner that harasses or humiliates employees." *Stockett v. Muncie Ind. Transit Sys.,* 221 F.3d 997, 1001-02 (7th Cir. 2000). Here, the BLA set forth guidelines for D&A testing of U.S. Steel's union employees. (Travis Decl. (3-19-12) ¶ 15; Travis Decl. (3-19-12), Ex. C.) The BLA permits testing where: (1) there is a reasonable basis

to believe the employee is affected by drugs or alcohol; and (2) the employee's coordination or judgment could have contributed to an accident. (Id.) Piar's decisions to have Walton take D&A tests after two crane accidents, which causes were attributable to human error, and due to his behavior on February 13, 2007, are consistent with the provisions of the BLA. (Walton Dep., Exs. 3, 5 & 6 at USS59). While he asserts that these tests were unnecessary, Walton provides no evidence to dispute the fact that Piar had discretion under the BLA to send him for D&A tests under certain circumstances. Furthermore, because Walton has offered no evidence that his testing was performed in a harassing or humiliating manner, this Court cannot view these D&A tests as constituting an adverse employment action.

Walton next complains that the discipline he received on December 11, 2006, and January 28, 2007, in relation to his two crane incidents constitute adverse employment actions. Walton, however, only received a written warning following the crane accident on December 11, 2006, and he never served the suspensions or lost pay following the disciplines issued on January 28, 2007, and on February 13, 2007, after his altercation with Piar. (Walton Dep. at 96, 134; Travis Decl. (3-19-12) ¶¶ 18 & 21; Travis Decl. (3-19-12) Ex. D at USS48.) The Seventh Circuit has held that these types of discipline are not adverse employment actions, particularly where, as here, Walton can show that he suffered no tangible job consequence. *Oest v. Ill. Dep't of Corrs.*, 240 F.3d 605, 612-13 (7th Cir. 2001) (written reprimands that do not implicate "tangible job consequences" are not materially adverse employment actions); *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005) ("[B]ecause [the plaintiff] never served the suspension, [the plaintiff] never realized any economic effect from the slated employment action. Simply put, a suspension without pay that is never served does not constitute an adverse employment action."). Even though Walton was sent home for the

balance of his shift on February 13, 2007, this decision did not amount to an adverse employment action. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004) (loss of one day of wages was not substantial enough to qualify as an adverse employment action). Furthermore, while Walton claims that the discipline increased his chances of being terminated, such a result is not inevitable as "job-related criticism can prompt an employee to improve [his] performance and thus lead to a new and more constructive employment relationship." *Whittaker*, 424 F.3d at 648. Because Walton suffered no tangible job consequences, the written reprimand and unserved suspensions are not materially adverse employment actions.[5] *See Price v. Ind. Nat'l Guard*, No. 1:08-cv-990, 2010 WL 1257463, at *5 (S.D. Ind. Jan. 20, 2010).

Even if Walton can show that the D&A tests and disciplinary measures constitute adverse employment actions, he cannot demonstrate that similarly situated employees were treated more favorably. "Where a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason, a plaintiff must show that he is similarly situated with respect to performance, qualifications and conduct." *Snipes v. Ill. Dep't of Corrs.*, 291 F.3d 460, 463 (7th Cir. 2002) (citing *Radue*, 219 F.3d at 617). "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue*, 219 F.3d at 617-18 (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). "All things being equal, if an employer takes an action against one employee in a protected class but not another

---

[5] While Walton complains that he was subjected to unwarranted disciplinary measures with respect to his December 11, 2006, crane incident because a supervisor named "Steve" investigated the accident, but Piar ordered a D&A test before the investigation was completed, Walton has offered no admissible evidence on this point.

outside that class, one can infer discrimination." *Filar*, 526 F.3d at 1061 (citing *Humphries*, 474 F.3d at 405)).

Walton contends that Mark Sutherland, a white employee, knocked over a coil while operating a crane on December 27, 2006, but he was not subject to an investigation, tested for drugs, or disciplined. (Walton Dep. at 60, 81.) But contrary to Walton's claim, U.S. Steel did investigate Sutherland's crane accident. (Walton Dep., Ex. 7.) And while Walton claims that his December 11, 2006, crane incident is similar to that of Sutherland, the record establishes that the accidents were the result of two different causes. Robert Knight investigated Sutherland's incident and Tom Puzas investigated Walton's incident. Both Knight and Puzas reached different conclusions about the causes of the respective accidents. (Walton Dep., Exs. 6 & 7; Travis Decl. (3-19-12), Ex. E.) Knight found that a coil being lifted by Sutherland's crane had coned at the bottom and struck a stack of coils causing the top coil to fall to the floor. (Walton Dep., Ex. 6; Travis Decl. (3-19-12), Ex. E.) Knight reported that Sutherland had no way of seeing that the eye of the coil had coned from the bottom and, as a result, Knight did not attribute the cause of the accident to human error. (Walton Dep., Ex. 7.) Puzas, on the other hand, found that Walton's accident was caused by human error because the crane repairmen inspected Walton's crane bridge brake, trolley and bridge, and found no root cause or problem. (Walton Dep., Exs. 5 & 6 at USS 59). Walton therefore cannot show that he was similarly situated to Sutherland because the circumstances of the two crane accidents were dissimilar and, as a result, Walton's incident warranted disciplinary measures.

Because Walton has failed to show that he suffered an adverse employment action with regard to his discipline or that similarly situated employees were treated more favorably, he cannot establish a prima facie case of race discrimination. Even assuming that Walton could make out a

prima facie case, he cannot show that U.S. Steel's proffered reasons for its D&A tests and disciplinary measures are pretextual. Here, U.S. Steel investigated Walton's crane accidents and the altercation Walton had with Piar, and provided valid, legitimate reasons for its decisions to send Walton for D&A tests and to issue discipline against him. Further, it is undisputed that Piar issued discipline to nine white employees for their involvement in crane accidents. (Travis Decl.(3-19-12) ¶ 22.) Because Walton cannot demonstrate pretext, his claim with respect to the D&A tests and discipline cannot stand.[6]

### d. Incentive Pay

In an affidavit contained in his supplemental response brief, Walton asserts that he suffered an adverse employment action because he lost incentive pay as a result of being placed in the South Sheet Mill. Here, Walton calculates that he lost $25,000 in incentive pay by working in the South Sheet Mill rather than the North Sheet Mill.

While Walton cannot defeat summary judgment by supplying this Court with a later-filed affidavit that contradicts his prior deposition testimony, *see LaFary v. Rogers Grp., Inc.,* 591 F.3d 903, 908 (7th Cir. 2010), even if he did receive lower incentive pay, he did not suffer an adverse employment action by being assigned to the South Sheet Mill because the job assignment was within U.S. Steel's discretion under the BLA. (Travis Decl. (5-30-12) ¶ 9.) The Seventh Circuit has repeatedly held that "even the denial of a monetary perk, such as a bonus or reimbursement of certain expenses, does not constitute an adverse employment action if it is wholly within the

---

[6] To the extent Walton claims that Whitlock was treated more favorably when he was disruptive to Piar during a safety meeting and was not disciplined for insubordination, Walton was not present at the meeting and he heard about this incident from other U.S. Steel employees. (Walton Dep. at 134-35.) Even if this evidence was admissible, Walton fails to show that Whitlock was similarly situated and how Walton's February 13, 2007, altercation with Piar is comparable to Whitlock's disruption during Piar's safety meeting. Thus, there is no evidence that Whitlock was insubordinate or refused to do something after being ordered to comply.

employer's discretion to grant or deny and is not a component of the employee's salary." *Hottenroth v. Vill of Slinger*, 388 F.3d 1015, 1030 (7th Cir. 2004) (internal quotation omitted) (finding that an adverse employment action does not include an employer's refusal to grant an employee a discretionary benefit to which he is not automatically entitled); *Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996) ("[L]oss of a bonus is not an adverse employment action in a case such as this where the employee is not automatically entitled to the bonus."). It is undisputed that Walton's base wage and benefits were not affected by his assignment to the South Sheet Mill and that Walton and Manning were both assigned to the South Sheet Mill and received the same incentive pay.[7] (Travis Decl. (5-30-12) ¶ 15.)

Because Walton cannot show that he suffered an adverse employment action or that similarly situated employees were treated better, he cannot establish a prima facie case of discrimination as it pertains to his incentive pay claim. Even assuming that Walton could make out a prima facie case, U.S. Steel has provided a legitimate, non-discriminatory reason for the way it handles incentive pay, which is not pretextual.

In sum, when viewing the evidence in the light most favorable to Walton, he has failed to raise a genuine issue of material fact with respect to his race discrimination claim. Accordingly, the Court grants summary judgment in favor of U.S. Steel as to Walton's Title VII and 42 U.S.C. § 1981 race discrimination claim.

---

[7] To the extent Walton asserts that he lost overtime opportunities by being placed in the South Sheet Mill, he does not offer any specific incidents of overtime opportunities in his prior department, the North Sheet Mill, that he would have worked had he stayed there, and he has not identified any instances where U.S. Steel gave overtime opportunities to employees in the South Sheet Mill, but denied those opportunities to him.

## B. Hostile Work Environment

Walton next claims that U.S. Steel separately violated Title VII by subjecting him to racially-charged harassment, comments, and symbols in the workplace. (Compl. ¶ 41.)

An employee is subjected to a hostile work environment "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993). To prevail on his racial harassment claim, Walton must have sufficient evidence to create a material issue of fact as to four elements: "(1) the work environment must have been both subjectively and objectively offensive; (2) his race must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must have been a basis for employer liability." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010). Factors that may be considered in determining whether the environment is hostile or abusive may include the frequency and severity of the conduct, whether it is physically threatening or humiliating, or merely an offensive utterance, and whether the conduct unreasonably interferes with an employee's work performance. *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691-92 (7th Cir. 2005) (citation omitted).

Walton's hostile work environment claim must fail because he has not produced evidence that shows that the workplace treatment he characterizes as harassment was the result of his African-American race. For example. Walton claims that he was subjected to a hostile work environment because he was not released to his new electrical learner position for three months. But as discussed in Part A of this opinion, Piar did not immediately release Walton to his new position because there was a shortage of crane operators and Walton produced no evidence to dispute Piar's reason for the

delay in his transfer.  *See Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004) (complaints about job transfers, a late overtime payment, salary, and difficulties with managers is "normal workplace friction" that does not constitute actionable harassment).

Walton also claims that he was subjected to a hostile work environment because he was denied hostage pay and was forced to endure unwarranted D&A tests and discipline.  But here he has offered no evidence that white employees received hostage pay or that U.S. Steel's handling of his hostage pay was uniquely hostile to African-American employees.  Walton also does not explain how the alleged denial of hostage pay altered the conditions of his employment.  Furthermore, Walton's allegations regarding his discipline do not serve as a basis for Walton to claim that he was subjected to a hostile work environment because these incidents were not sufficiently severe or pervasive to create an abusive working environment.  *See Glebocki v. City of Chi.*, 32 F. App'x 149, 154 (7th Cir. 2002) (finding that the supervisor's conduct—which allegedly included closely scrutinizing the plaintiff's behavior; initiating numerous disciplinary investigations against the plaintiff; and recommending unusually harsh discipline against the plaintiff—may have "inconvenienc[ed]" the plaintiff but "did not create an objectively hostile work environment.").

Walton's other alleged comments and acts also do not rise to the level of actionable harassment.  For example, Walton's allegation that Guardardo indicated that white workers on the electrical crew would be upset if he passed the electrical learner's test, his observation of co-workers with shaved heads and one worker with a Confederate flag tattooed on his arm, and his observation of a poster that pictured tanks, airplanes, and soldiers marching with Nazi flags, are not sufficiently severe and pervasive to establish a hostile work environment.  Walton does not allege that these were directed to him or altered the terms and conditions of his employment.  Furthermore, Walton's

allegation that Sandifer's comment that a co-worker called the USW Griever a "nigger lover" because he objected to the discipline Piar issued to Walton does not establish a hostile work environment claim because the comment was not directed to Walton and was not mentioned in his presence.  *See Beamon v. Marshall & Ilsley Trust Co.,* 411 F.3d 854, 863 (7th Cir. 2005) ("the alleged harassment must be 'sufficiently connected to race' before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race"); *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005) (holding that an objective hostile work environment will not be found where "[m]ost of the conduct that forms the basis of [the plaintiff's] claim consists of derogatory statements made by supervisors or co-workers out of [the plaintiff's] hearing," and the remaining incidents were "isolated and not particularly severe.").  Therefore, the comments and acts Walton alleges do not individually or collectively create a hostile work environment.

Furthermore, Walton cannot establish that U.S. Steel was negligent in discovering or remedying harassment because U.S. Steel has anti-harassment policies in place and, with the exception of Walton's locker incident, he did not report those comments or acts he now alleges constitute harassment to U.S. Steel management.  (Walton Dep. at 24-25, 42, 140-41.)  While he did report the fact that his locker had been vandalized, U.S. Steel responded by having Travis speak to employees about the conduct and by investigating the incident.  (Travis Decl. (3-19-12) ¶¶ 27-31; Walton Dep., Ex. 8.)  Therefore, Walton cannot establish the requisite employer liability herein.

In sum, when viewing the evidence in the light most favorable to Walton, he has failed to raise a genuine issue of material fact with respect to his hostile work environment claim.  Accordingly, the Court grants summary judgment in favor of U.S. Steel as to Walton's Title VII hostile work environment claim.

## C. Retaliation

Lastly, Walton claims that U.S. Steel retaliated against him for engaging in a number of protected activities in violation of Title VII.

Retaliating against an employee for engaging in protected activity is prohibited by Title VII. 42 U.S.C. § 2000e-3(a); *Egan v. Freedom Bank*, 659 F.3d 639, 642 (7th Cir. 2011). As with discrimination claims, an employee alleging retaliation may proceed under either the direct or indirect method. *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 740 (7th Cir. 2011). Under the direct method, a plaintiff must establish a prima facie case by showing that: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the two. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004). A plaintiff relying on the direct method of proof may establish the causal link with direct evidence or by demonstrating "a 'convincing mosaic' of circumstantial evidence" that would permit an inference of discrimination. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011) (quoting *Rhodes*, 359 F.3d at 504 (quoting *Troupe*, 20 F.3d at 737)). Alternatively, under the indirect method, a plaintiff must establish that: (1) he engaged in statutorily protected activity; (2) he was performing his job according to his employer's legitimate expectations; (3) despite his satisfactory job performance, he suffered an adverse employment action; and (4) he was treated differently and less favorably than similarly situated employees who did not engage in statutorily protected activity. *Luckie*, 389 F.3d at 714.

Walton alleges that he was subjected to retaliation in a number of ways after he engaged in protected activity. (Compl. ¶¶ 48-50, 52, 55.) He first claims that his locker was vandalized on February 2, 2007, after allegedly complaining of discrimination on January 29, 2007. Next, Walton

asserts that he was subjected to a D&A test and unwarranted discipline on February 13, 2007, after he complained of discrimination to the USW on February 12, 2007. He also contends that other events, including his retention as a crane operator in the North Sheet Mill for three months, and his observing the poster that pictured tanks, airplanes, and soldiers marching with Nazi flags in July 2008, constitute acts of retaliation.

Walton's retaliation claim, however, cannot stand because he has failed to establish the necessary inference of causation between his complaints to Piar or Piar's supervisors and his allegedly adverse employment actions. For example, Walton has presented no evidence that his locker incident was motivated by his conversation with Piar on January 29, 2007, when he alleges he complained to Piar that both Sutherland and Whitlock were treated more favorably. Walton testified that he did not know who vandalized his locker and had no evidence that Piar said anything to Sutherland or Whitlock about his complaint. (Walton Dep. at 101-02.) Therefore, Walton cannot establish the requisite causal connection between his complaint to Piar and his locker incident. *See Patton v. Indianapolis Pub. Sch. Bd.,* 276 F.3d 334, 340 (7th Cir. 2002).

Walton also cannot establish a retaliatory connection between the D&A test and discipline he received from Piar on February 13, 2007, after he complained of discrimination to Piar's supervisors on February 12, 2007. While Walton can show that Piar knew he complained to the USW on February 12, he has failed to present evidence that Piar knew the substance of Walton's complaint or that Piar knew that Walton complained about discrimination. Because Walton cannot show that Piar knew he made allegedly statutorily protected complaints, he cannot establish causation under the direct method of proof. *See Maarouf v. Walker Mfg. Co.,* 210 F.3d 750, 755 (7th Cir. 2000) (absent knowledge on decisionmaker's part of protected activity, the plaintiff lacks a

causal link between the termination and the complaint of discrimination); *Luckie*, 389 at 715 (noting that a necessary component of intentional discrimination by the decisionmaker is that the decisionmaker had actual knowledge of the plaintiff's complaints).

Walton's retaliation claim also does not satisfy the adverse employment action element under either the direct or indirect methods of proof. As discussed in Part A of this opinion, Walton's D&A test on February 13, 2007, was administered pursuant to the BLA and Walton does not allege that the test was conducted in a harassing manner. Additionally, because Walton did not serve the suspension issued on February 13, 2007, and missed only the balance of his shift that day, he did not suffer a materially adverse employment action. U.S. Steel provided a legitimate, non-discriminatory reason for testing Walton and issuing the discipline. Walton presented no evidence to show that U.S. Steel's proffered reason was pretextual. Furthermore, under the indirect method, again as discussed in Part A of this opinion, Walton has not identified any similarly situated individuals who were treated more favorably.

Walton also cannot establish a retaliation claim with respect to his three-month retention as a crane operator and his observation of the poster in July 2008. First, Walton has offered no evidence to suggest that being retained as a crane operator was retaliation for complaining about race discrimination. Also, as explained, Piar's decision to retain Walton for three months did not constitute an adverse employment action. With regard to the poster incident, Walton does not allege that anyone at U.S. Steel displayed the poster because he engaged in protected activity. Nor has he presented any evidence that U.S. Steel knew about or condoned displaying the poster.

In sum, when viewing the evidence in the light most favorable to Walton, he has failed to raise a genuine issue of material fact with respect to his retaliation claim. Accordingly, the Court grants summary judgment in favor of U.S. Steel as to Walton's Title VII retaliation claim.

## CONCLUSION

Based on the foregoing reasons, the Court hereby **GRANTS** U.S. Steel Corporation's Motion for Summary Judgment [DE 27], **DENIES as moot** Plaintiff's Motion for Oral Arguments [DE 39] and **DENIES as moot** U.S. Steel's Motion to Strike Affidavits and Portions of Affidavits Relied Upon by Plaintiff in Opposition to United States Steel Corporation's Motion for Summary Judgment [DE 40]. The Court **DIRECTS** the Clerk of Court to enter judgment in favor of Defendant U.S. Steel Corporation and against Plaintiff David L. Walton, Jr. as to all claims in Plaintiff's Complaint.

The Final Pre-Trial Conference and trial settings in this case are vacated.

SO ORDERED this 15th day of August, 2012.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record